## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

**DANIEL L. WELSH,**

        **Plaintiff,**

**vs.**                                                    **CASE NO. 2:15-cv-06061**

**CAROLYN W. COLVIN, Acting**
**Commissioner of Social Security,**

        **Defendant.**


**PROPOSED FINDINGS AND RECOMMENDATION**

     Pending before this Court is Plaintiff's Brief in Support of Motion for Judgment on the

Pleadings (ECF No. 10), the Commissioner's Brief in Support of Defendant's Decision (ECF No.

11) and Plaintiff's Reply to Brief in Support of Defendant's Decision (ECF No. 12).

<u>Background</u>

     On June 18, 2013, Daniel Lee Welsh, Claimant, applied for disability and disability

insurance benefits, alleging disability beginning June 1, 2011.  The claim was denied initially on

August 23, 2013, and upon reconsideration on November 8, 2013.  Claimant filed a written request

for hearing on January 6, 2014.  Thereafter, on May 13, 2014, Claimant appeared via video hearing

from Parkersburg, West Virginia, and the administrative law judge (ALJ) presided over the hearing

from Charleston, West Virginia.  A supplemental hearing was held on December 8, 2014.  On

December 30, 2014, the ALJ denied Claimant's application. On February 27, 2015, Claimant filed

a request for review of the hearing decision by the Appeals Council (AC).  On March 25, 2015,

the Appeals Council denied Claimant's request for review.  The Notice of Appeals Council Action

stated "We found no reason under our rules to review the Administrative Law Judge's decision" (Tr. at 1).  Thereafter, Claimant filed the instant complaint with this Court for judicial review, objecting to the final decision of the Commissioner and seeking remand and reversal of the ALJ's decision.

<u>Standard of Review</u>

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.  *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2014).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  *Id.* § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  *Id.* § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  *Id.* § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  *Id.* § 404.1520(d).  If it does, the claimant is found disabled and awarded benefits.  *Id.*  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  *Id.* § 404.1520(e).  By satisfying inquiry four, the claimant establishes a *prima facie* case of disability.  *Hall v. Harris,* 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir.

2

1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.   20 C.F.R. § 404.1520(f) (2014).   The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date of June 1, 2011, and meets the insured status requirements of the Social Security Act through September 30, 2016 (Tr. at 16).   Under the second inquiry, the ALJ found that Claimant suffers from the severe impairment of attention deficit hyperactivity disorder (ADHD), not otherwise specified (NOS). (*Id.*)   At the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled the level of severity of any listing in Appendix 1 (Tr. at 18).   The ALJ then found that Claimant has a residual functional capacity to perform a full range of work at all exertional levels[1] (Tr. at 19).   The ALJ held that Claimant could perform unskilled work in the national economy in jobs such as: various heavy labor jobs; heavy exertion, janitor; medium exertion, material handler; medium exertion, laundry worker; light exertion, cleaner; and light exertion, general laborer (Tr. at 23). On this basis, benefits were denied (Tr. at 24).

---

[1]  The ALJ found that Claimant is limited to perform simple repetitive tasks, with occasional contact with supervisors and coworkers but should not work with the public or in crowded facilities.   Work should be in a low stress environment without strict deadlines or high production quotas and with few changes in the routine and environment (Tr. at 19).

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In *Blalock v. Richardson*, substantial evidence was defined as:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner in this case is not supported by substantial evidence.

Claimant's Background

Claimant was born on November 23, 1975, and was 35 years old on the alleged disability onset date.  Claimant has at least a high school education (See Tr. at 34).  At the time of the hearing, Claimant was married with one child (Tr. at 35).  Claimant served in the military for approximately two and a half to three years (Tr. at 36).

4

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that this matter should be remanded under sentence six of 42 U.S.C. § 405(g) for the consideration of new and material evidence.  Claimant argues that the ALJ's residual functioning capacity finding (RFC) is not supported by substantial evidence as the record showed that Claimant is unable to perform the basic mental demands of even unskilled work (ECF No. 10).  Defendant asserts that Claimant could perform the minimal demands of the unskilled work the vocational expert (VE) identified at the hearing (ECF No. 11).  Also, Defendant avers that the additional evidence does not warrant a remand.

<u>Medical Record</u>

Claimant asserts that "The issues in this case are primarily procedural.  For the sake of brevity, any medical evidence relevant to the issues and arguments herein will be noted in the body of the Argument, *infra*" (ECF No. 10). The Court agrees and adopts the medical record findings asserted by the Claimant and the Defendant to the extent as follows (ECF Nos. 10, 11 & 12):

> Claimant's school records that revealed he had an individualized education plan, but his placement was in a regular classroom full-time (Tr. 241-46).   Notably, a multi-factored evaluation team report drafted when Claimant was in seventh grade did not indicate that Claimant had been diagnosed with ADHD (Tr. 265-72).  Intelligence testing revealed a full-scale IQ of 104, which was "well within the average range of intellectual functioning" (Tr. 267).   Based upon the multi-factored evaluation, the committee determined that even though Claimant was achieving below his intellectual ability, his performance did not suggest a learning disability (Tr. 268).
>
> In January 2012, Douglas W. Fischer, M.D., a licensed psychologist, examined Claimant to assist in field rehabilitation service planning (Tr. 313-20).   Claimant wanted to attain educational accommodations due to possible ADHD (Tr. 313). While Claimant reported that he alternated between employment with Wendy's and McDonald's for the past ten years, he had most recently worked at McDonald's for two years (Tr. 313).  Claimant

indicated that he was diagnosed with ADHD at the age of 30 by a psychiatrist at the Worthington Center (Tr. 313-14).

A mental status examination revealed that Claimant's eye contact and psychomotor activity were within normal limits (Tr. 314). He was fully oriented, and his speech was relevant and coherent (Tr. 314). His judgment, recent memory, and immediate memory were within normal limits (Tr. 314). Claimant denied any difficulty with sleep, appetite, or energy (Tr. 314). However, Claimant's attention/concentration was severely deficient as indicated by a scaled score of three on the digit span test of the Wechsler Adult Intelligence Scale-IV (WAIS-IV) (Tr. 314). Claimant described his mood as "happy-go-lucky" with an observed euthymic mood and congruent affect (Tr. 314). Claimant denied any obsessive-compulsive behaviors or symptoms of mania (Tr. 314). His ability to think abstractly was within normal limits as evidenced by proverbs (Tr. 314). Claimant's insight was adequate (Tr. 314). IQ testing with the WAIS-IV yielded the following results:  a verbal comprehension score of 95 (average range); a perceptual reasoning score of 94 (average range); a working memory score of 66 (extremely low range); a processing speed of 100 (average range); and a full scale IQ score of 87 (low average range) (Tr. 315). Psychologist Fisher also administered the Woodcock-Johnson Tests of Achievement- III (WJ-III) that revealed achievement scores that were fairly commensurate with the ability estimates assessed by the WAIS-III; therefore, the scores did not suggest the presence of any overt learning disabilities (Tr. 317). Significantly, the clinical index of the Clinical Assessment of Attention Deficit-Adult indicated an overall level of behavioral adjustment within the normal range (Tr. 319). Testing with the Beck Depression and Anxiety inventories revealed scores in the mild and minimal range respectively (Tr. 319). Consequently, Psychologist Fischer's impressions were ADHD, not otherwise specified, with a current Global Assessment of Functioning (GAF) of 75 (Tr. 319).[2] Psychologist Fischer explained that he diagnosed ADHD despite a clinical index within the normal range on the Adult ADHD test based upon Claimant's history, self-report, and the working memory score from the WAIS-IV (Tr. 320). Consequently, Psychologist Fischer opined that Claimant would benefit from a psychiatric consultation to address the necessity of a stimulant medication and suggested individual supportive

---

[2]A GAF between 71 and 80 indicates, "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g. difficulty concentrating after a family argument); no more than slight impairment in social, occupational, or school functioning (e.g. temporarily falling behind in school work). *The American Psychiatric Association Diagnostic & Statistical Manual of Mental Disorders*, 32 (4th Ed. 1994).

psychotherapy (Tr. 320). Finally, he recommended the following educational accommodations: additional time to complete assignments, one-on-one attention, preferential seating, and alternative testing environments (Tr. 320).

In June 2012, Debra Simons, C.F.N.P., of Schwabe & Associates, first examined Claimant to evaluate whether to restart Claimant on ADHD medication[3] (Tr. 288-89). At that time, she noted that a physician at the same facility previously treated Claimant for ADHD in 2005 and 2006 (Tr. 288). A mental status examination revealed that Claimant was punctual for his appointment with a neat appearance and appropriate dress (Tr. 289). His mood was euthymic (Tr. 289). Claimant's affect was smiling and happy (Tr. 289). His thought content was relevant (Tr. 289). Claimant's thought processes and speech were rapid, but logical (Tr. 289). His psychomotor activity was slightly hyperactive (Tr. 289). Claimant's insight and judgment were fair, but his attention span and concentration were poor (Tr. 289). He denied any suicidal or homicidal ideation (Tr. 289). His association and reality testing appeared intact (Tr. 289). Ms. Simons' impression was ADHD (Tr. 289). She assigned a GAF of 58 to 60 (Tr. 289).[4] Ms. Simons offered individual therapy, but Claimant declined (Tr. 289). Claimant also did not want to take Adderall again due to withdrawal symptoms, so Ms. Simons prescribed Vyvanse (Tr. 289).

At Claimant's next visit in July 2012, Claimant indicated that he was "good" (Tr. 308). A mental status examination revealed a calm mood, pleasant affect, relevant thought content, and clear speech and thought processes (Tr. 308). Claimant's psychomotor activity was within normal limits (Tr. 308). His insight and judgment were "fair," and his memory was intact (Tr. 308-09). Notably, his attention span and concentration were "better" (Tr. 308).

In February of 2013, Claimant was concerned that his medication was wearing off before he was finished [with] classes, which were scheduled at 9 a.m. and 6:30 p.m., so his dosage of Vyvanse was increased (Tr. 297). Ms. Simons also prescribed Clonidine due to complaints of difficulty sleeping (Tr. 297). At Claimant's next follow up visit in March, he was "happy" with his medications and his classes were "going good" (Tr. 294-95). A mental status examination was unchanged except his attention span and concentration were "a lot better" (Tr. 294-95). Claimant indicated that he was sleeping "good" with Clonidine, so his

---

[3]  Claimant returned to Ms. Simons approximately monthly for follow-up visits until May 2013 (Tr. 290-311).

[4]  A GAF between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

medications were continued (Tr. 295). At Claimant's April 2013 follow-up session, Claimant indicated that his math class was too difficult for him (Tr. 293).

On May 20, 2013, Claimant reported that [he] was "looking for a job" (Tr. 290). Ms. Simons' examination revealed that Claimant's mood was calm, and his affect was pleasant (Tr. 290). He displayed relevant thought content and clear thought processes and speech (Tr. 290). Claimant's psychomotor activity was within normal limits (Tr. 290). His judgment and insight were fair (Tr. 290). Claimant's attention span and concentration were "ok" (Tr. 290). His recent and remote memory were intact (Tr. 291).

Based upon a review of the medical evidence of record in November 2013, Thomas Lauderman, D.O., a state agency physician, opined that there was insufficient evidence to make a determination (Tr. 72-73). Sushil M. Sethi, M.D., performed a disability determination examination on Claimant in June 2014 (Tr. 321-32). At that time, Claimant complained of dyslexia, back spasms, left knee problems, ADHD, and insomnia (Tr. 321). A physical examination revealed a normal blood pressure and gait (Tr. 322-23). A straight leg-raising test was negative (Tr. 323). Claimant had diffuse tenderness of the patella with crepitus (Tr. 323). An examination of the lumbosacral spine revealed diffuse tenderness of the lumbar spine from L1 to S1, but no obvious muscle spasm (Tr. 323). On July 22, 2014, Amy Gurthrie, M.A., and Joseph Kennell, PH.D., conducted a mental status examination of Claimant. He had a normal range of motion in all areas except a slightly decreased range of motion of the lumbar spine (75 degrees, rather than 90 degrees) (Tr. 332). Dr. Sethi's impressions were a history of chronic back spasms, arthritic complaints of the knee, ADHD, and insomnia (Tr. 323). He opined that Claimant's ability to work at physical activities "may be slightly affected" (Tr. 323).

Amy Guthrie, M.A., a licensed psychologist, examined Claimant in July 2014 (Tr. 333-42). X-rays of Claimant's left knee and lumbar spine performed due to Claimant's complaints of pain revealed no significant degenerative process (Tr. 343). Significantly, Claimant reported that Ms. Simons at Schwabe & Associates had been treating him monthly, but he quit because he did not think it was helpful (Tr. 335). Claimant also stated that the Army "used [him] as a pack mule and ended up compressing [his] spine" (Tr. 336). He further indicated that his platoon abused him, so he refused to go on a trip alone with his platoon sergeant because he thought he was going to be injured or killed (Tr. 336). Consequently, he was Absent Without Leave (AWOL) and spent 30 days in jail (Tr. 336). Although he denied having flashbacks on a

regular basis, he reported that, at times, events have triggered images from his military years (Tr. 337). Notably, he reported obsessive-compulsive traits (Tr. 334), even though he denied these symptoms to Psychologist Fischer (Tr. 314).

Psychologist Guthrie's mental status examination revealed that Claimant was cooperative, but somewhat guarded (Tr. 337). Claimant's speech was coherent and relevant (Tr. 337). He was fully oriented, but mildly anxious (Tr. 337). His thought process was coherent (Tr. 337). He denied any general suspiciousness of people, but thought people were "out to get him" in the Army (Tr. 337). His insight was mildly deficient, and his judgment was moderately deficient (Tr. 337). Claimant had mildly increased psychomotor behavior (Tr. 337). His immediate and recent memory was mildly deficient and his remote memory was within normal limits (Tr. 337). Claimant's concentration was moderately to markedly deficient based on his ability to complete serial threes or serial sevens, even though he was able to recall three numbers backward in a series and recite the days of the week backwards (Tr. 337). His persistence and pace was within normal limits (Tr. 337). Psychologist Guthrie opined that Claimant's social functioning was mildly deficient because he presented with a mildly anxious mood and appeared to be guarded at times (Tr. 337).

Psychologist Guthrie diagnosed social anxiety disorder, based upon his report of anxiety in the presence of others; unspecified depressive disorder, based upon Claimant's self-report; and post-traumatic stress disorder (PTSD), based upon his report of abuse in the military and flashbacks (Tr. 338). Although she believed that Claimant's prognosis was guarded due to his trauma history, she nevertheless indicated that he could handle his own finances (Tr. 338).

Psychologist Guthrie completed a medical source statement indicating that Claimant had no impairment in understanding, remembering and carrying out simple instructions and a mild impairment in the ability to make judgments on simple work-related decisions (Tr. 340-41). However, she opined that Claimant had a marked ability to interact appropriately with the public, supervisors, and co-workers, and respond appropriately to changes in work settings due to his abuse history and social anxiety (Tr. 341). Finally, Psychologist Guthrie stated, "It is not likely that [Claimant] could attend work on a regular basis. He would likely be unreliable and make careless mistakes. He cannot act appropriately with customers" (Tr. 341).

In November 2014, Allan D. Figueroa, M.D., examined Claimant as a new patient (Tr. 352-55). At that time, Claimant

reported that he had not seen a family physician for several years, but treated with Dr. Schwabe for anxiety and ADHD (Tr. 352). Dr. Figueroa diagnosed Claimant with gastroesophageal reflux disease (GERD) due to his heartburn complaints and refilled Claimant's prescription for Prilosec (Tr. 354). He also recommended a stress test due to Claimant's complaints of chest pain (Tr. 354).

Claimant's counsel requested that Claimant's employer, Allan Snider, General Manager at McDonald's, answer four questions about Claimant's employment (Tr. 260-61). Mr. Snider stated that Claimant had difficulty at work due to a lack of focus and was transferred to different locations and jobs until he was "let go" after 18 months (Tr. 261). He also stated, "[Claimant] is a likeable person, but must be watched on a regular basis" (Tr. 261). When asked if Claimant made careless mistakes, Mr. Snider indicated that Claimant "made it hard for other employees" because his part of the job was not being completed correctly (Tr. 261). Mr. Snider opined that Claimant performed tasks in a timely manner "maybe 50% of the time with some help" (Tr. 261). He further opined that Claimant could perform any job at McDonald's with "a focus on his part and somebody to help him" (Tr. 261).

<u>Claimant's Testimony</u>

At the hearing in May 2014, Claimant testified that his military discharge after two and one-half to three years was "other than honorable" (Tr. 36). He explained, "I got my life threatened, so I just got out. I wasn't going to sit around waiting for a bullet in my back. Some say it was paranoia" (Tr. at 36). Claimant clarified that his chain of command wanted to shoot him and stated, "There was a couple of people that wanted me silenced because I knew too much information, what was going on with—and they didn't want to risk their career over a peon E3." (Tr. at 36-37).

Also, Claimant testified that he damaged his knee during a training exercise in Korea in 1998 (Tr. at 37). Claimant stated "We were doing a competition of who could get through the confidence course faster. And I was winning until the incident where I climbed a rope and missed my footing, and fell straight down – straight leg [sic] on my left leg. During a training exercise in

10

Fort Campbell, Kentucky, in 1999, Claimant injured his back. He testified that he fell out of a helicopter "a good 20 feet" to the ground while traveling "about 30-40 miles per hour" during the training exercise (Tr. at 37- 38).  He stated at the hearing "I was in the door [of the helicopter] and my weapon – we were probably 20 feet from landing and my weapon hit my chest, my belt buckle thing, and I fell out of the helicopter" (Tr. at 38).

Credibility Determination

An ALJ's decision must "contain specific reasons for the findings on credibility, supported by the evidence in the case record" that are "sufficiently specific to make clear . . . the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p; 20 CFR §404.1529. An ALJ is required to evaluate seven factors in determining credibility. Social Security Ruling 96-7p provides the following:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the  individual's pain  or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See also Craig v.*

11

*Chater*, 76 F.3d 585, 594 (4th Cir. 1996); *Adkins v. Astrue*, 664 F. Supp. 2d 657, 667-668 (S.D. W. Va. 2009).

The ALJ must accompany his decision with sufficient explanation to allow a reviewing court to determine whether the Commissioner's decision is supported by substantial evidence. The Commissioner is required to include in the text of [his] decision a statement of the reasons for that decision. *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986). The ALJ's "decisions should refer specifically to the evidence informing the ALJ's conclusion. This duty of explanation is always an important aspect of the administrative charge. . . ." *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985).

The Fourth Circuit has held that an ALJ's credibility findings are "virtually unreviewable by this court on appeal." *Darvishian v. Green*, 404 F. App'x 822, 831 (4th Cir. 2010) (citing *Bieber v. Dept. of the Army*, 287 F.3d 1358, 1364 (Fed. Cir. 2002)); *Salyers v. Chater*, No. 96-2030, 1997 WL 71704, at *1 (4th Cir. Feb. 20, 1997) (unpublished) (an "ALJ's credibility findings… are entitled to substantial deference"). When evaluating a claimant's testimony, the ALJ first considers whether the claimant has one or more medically determinable impairments that could reasonably be expected to produce the symptoms alleged. *See* 20 C.F.R. §§ 404.1529(b) and 416.929. If such an impairment(s) exists, the ALJ then evaluates the intensity, persistence and limiting effects of the alleged symptoms arising from these impairments to determine the extent to which the alleged symptoms limit the claimant's ability to work. *See* 20 C.F.R. §§ 404.1529(c) and 416.929.

As the fact-finder, the ALJ has the exclusive responsibility for making credibility determinations. *See*, *Shively v. Heckler*, 739 F.2d 987, 989-990 (4th Cir. 1984) (stating that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the

claimant, the ALJ's observations concerning these questions are to be given great weight").  The Code of Federal Regulations states that "[w]e will consider all of the evidence presented, including information about your work record, your statements about your symptoms, evidence submitted by your treating, examining or consulting physician or psychologist, and observations by our employees and other persons."  20 C.F.R. §§ 404.1529(c)(3) and 416.929.

<u>Discussion</u>

Claimant has moved this court, pursuant to the sixth sentence of 42 U.S.C. § 405(g), to remand his claim to the administrative level for consideration of new evidence.  In considering Claimant's motion to remand, the court notes initially that the social security regulations allow two types of remand. First, under the fourth sentence of 42 U.S.C. § 405(g), the court has the general power to affirm, modify or reverse the decision of the Commissioner, with or without remanding the cause for rehearing for further development of the evidence.  42 U.S.C. § 405(g); *Melkonyan v. Sullivan, 501 U.S. 89, 97 (1991).*  Second, where there is new medical evidence, the court may remand under the sixth sentence of 42 U.S.C. § 405(g) based upon a finding that the new evidence is material and that good cause exists for the failure to previously offer the evidence.  42 U.S.C. § 405(g); *Melkonyan*, 501 U.S. at 97.  The Supreme Court has explicitly stated that these are the only kinds of remand permitted under the statute.  *Melkonyan*, 501 U.S. at 98.

In order to justify a remand to consider newly submitted medical evidence, the evidence must meet the requirements of 42 U.S.C. § 405(g) and *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985).[5]  In *Borders*, the Fourth Circuit held that newly discovered evidence may warrant a

---

[5] Within relevant case law, there is some disagreement as to whether 42 U.S.C. § 405(g) or the opinion in *Borders* provides the proper test in this circuit for remand of cases involving new evidence.  This court will apply the standard set forth in *Borders* in accordance with the reasoning previously expressed in this district:

13

remand to the Commissioner if four prerequisites are met:  (1) the evidence is relevant to the determination of disability at the time the application was first filed and not simply cumulative; (2) the evidence is material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant has presented to the remanding court "at least a general showing of the nature" of the newly discovered evidence.  *Id.*

Claimant asserts that this matter should be remanded under sentence six of 42 U.S.C. § 405(g) for the consideration of new and material evidence. Claimant's counsel informed the ALJ during the hearing that requests had been made for the VA medical records and that Claimant was waiting receipt (Tr. at 50).  However, the additional evidence was not considered by the ALJ or the AC.  The medical records from the Veterans Affairs were first submitted upon complaint to the district court.

Claimant's Brief in Support of Motion for Judgment on the Pleadings to the district court contains an exhibit consisting of his military medical records from 1996 through 2001 (ECF No. 10-2).  Claimant asserts that he "was unable to compel release of the records prior to or

---

The court in *Wilkins v. Secretary of Dep't of Health & Human Servs.*, 925 F.2d 769 (4th Cir. 1991), suggested that the more stringent *Borders* four-part inquiry is superseded by the standard in 42 U.S.C. 405(g).  The standard in § 405(g) allows for remand where "there is new evidence which is material and . . . there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  However, *Borders* has not been expressly overruled.  Further, the Supreme Court of the United States has not suggested that <u>Borders</u>' construction of § 405(g) is incorrect.  Given the uncertainty as to the contours of the applicable test, the Court will apply the more stringent *Borders* inquiry.

*Brock v. Secretary, Health and Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992) (citations omitted).

immediately after the date of his ALJ decision" (ECF No. 10).   Claimant's Brief included attachments of letters from Claimant's counsel to the Department of Veterans Affairs Records Management Center in Saint Louis, Missouri, dated November 13, 2014, before the hearing, and January 8, 2015, following the hearing, but before the Appeals Council's decision.   Despite the earlier requests, Claimant obtained a copy of the records from the Department of Veterans Affairs on July 27, 2015.

The ALJ held that Claimant's allegations of disabling symptoms and limitations are diminished due to Claimant's lack of credibility. Specifically, the ALJ discussed her skepticism of the truthfulness of Welsh's testimony, such as his assertion that he damaged his left knee when he fell out of a helicopter while in the military. The newly submitted VA medical records report Claimant's continuing symptoms of knee pain and record of his medical care (Tr. at 464, 468, 470, 471, 476). The VA medical records report that Claimant was treated for knee pain and that he first hurt his knee in September of 1998 when "he dropped 20 ft. and landed on his knee" (Tr. at 470).   Therefore, consideration of the newly submitted VA medical records might have altered the ALJ's disability determination.

<u>Residual Functional Capacity</u>

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity (RFC) for substantial gainful activity.   "RFC represents the most that an individual can do despite his or her limitations or restrictions."   *See* Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996).  Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job.   20 C.F.R. §§ 404.1545(a) and 416.945(a) (2015).  "This assessment of your remaining capacity for

work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." *Id.* "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner.  See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2015).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.  *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

This Court recently explained the ALJ's obligation to review and discuss probative evidence considered and rejected when making RFC findings:

> While an ALJ is not required to comment on every piece of evidence in the record, he is obligated to discuss the evidence supporting his decision as well as "the uncontroverted evidence he chooses not to rely upon," and "significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir.1996) (citing *Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393 (9th Cir. 1984)). The ALJ must "explain on the record the reasons for his findings, including the reason for rejecting relevant evidence in support of the claim. Even if legitimate reasons exist for rejecting or discounting certain evidence, the [ALJ] cannot do so for no reason or for the wrong reason." *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir.1980) (citation omitted). *Meadows v. Colvin*, 2015 U.S. Dist. LEXIS 79035, *43 (S.D. W. Va. May 26, 2015).

In *Meadows*, the ALJ failed to analyze and discuss medical evidence related to the claimant's cardiac impairments that could have made "a major difference in the RFC finding." *Meadows, id.* at *44. Because the Court could not "tell whether [the ALJ's] decision is based on substantial evidence," the ALJ's error was not found to be harmless, and the matter was remanded. *Meadows, id.*, citing *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986).

In the present matter, the ALJ made her RFC finding that Claimant could perform simple repetitive tasks in a low stress environment based on a "consideration of the entire record" (Tr. at 19). However, the ALJ failed to consider all of the relevant evidence in the record because she did not possess Claimant's VA medical records.

<u>Conclusion</u>

The ALJ's decision is not supported by substantial evidence. Therefore, for the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge GRANT Plaintiff's Brief in Support of Motion for Judgment on the Pleadings (ECF NO. 10), DENY Defendant's Brief in Support of Defendant's Decision (ECF No.11), REVERSE the final decision of the Commissioner, REMAND this case for further proceedings pursuant to the sixth sentence of 42 U.S.C. § 405(g) and place this matter on this Court's inactive docket until the post remand proceedings are completed and the Commissioner has filed the results of such proceedings with this court in compliance with the statutory requirements set forth in 42 U.S.C. § 405(g).

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to District Judge Thomas E. Johnston. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then ten days (filing of

objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to counsel of record.

Enter:  June 8, 2016

Dwane L. Tinsley
United States Magistrate Judge

18